ALBERT N. EDWARDS, Respondent, v. THE HOME INSURANCE COMPANY, Appellant.

St. Louis Court of Appeals, December 9, 1902.

1. **Insurance, Fire:** INSURANCE BROKERS NOT SPECIAL AGENTS. Revised Statutes 1899, section 7997, provides that whoever, for compensation negotiates contracts of insurance or placing risks for any person other than himself, and not being the appointed agent or officer of the company in which such insurance is effected, shall be deemed an insurance broker. *Held*, that where a firm of insurance agents had represented a corporation in placing all their insurance, part of which was placed in companies represented by such agents, and the balance negotiated through other agents, receiving their compensation for policies so placed by deducting their fees from the premiums paid them by the corporation before turning such premiums over to the agents of the insurance companies writing the policies, such firm, as to such policies, were insurance brokers, and not mere special agents for the corporation for the issuance of insurance.

2. ———: ———: BROKERS WHEN GENERAL AGENTS. A broker employed by an owner to procure a policy of insurance on property has completed his work when he gets the insurance, and notice to him by a company that wrote a risk obtained by him is no notice to the assured, but on the contrary when brokers for several years had had entire charge of the insurance affairs of the corporation, and had issued and obtained all the insurance written on the corporation's property, they had authority to receive notice of cancellation of a policy written by a company which they did not represent, but which they had obtained through another agency.

Appeal from St. Louis City Circuit Court.—*Hon. D. D. Fisher*, Judge.

REVERSED.

*Fyke Bros., Snider & Richardson* for appellant.

(1) Notice of cancellation to agents or brokers of the insured, such as the evidence shows Roeslein & Robyn to have been in this case, is sufficient notice. 16 Am. and Eng. Ency. Law (2 Ed.), p. 974; Standard

Oil Co. v. Ins. Co., 64 N. Y. 85.   (2)   The bank therefore was the real beneficiary in the deed of trust and mortgage and the surrender by it of the policies under the circumstances was sufficient to constitute a cancellation thereof.   Fire Ins. Co. v. Reynolds, 36 Mich. 502; Ins. Co. v. Wright, 55 Fed. 455, reversing 53 Fed. 340; Kooistra v. Ins. Co., 81 N. W. 568; White v. Ins. Co., 93 Fed. 161.   (3)   Notice to it was notice to the insured; at all events the defendant had the right to assume that the party in rightful custody of the policy had the right to surrender it.   Kooistra v. Ins. Co., 81 N. W. 568; Ins. Co. v. Reynolds, 36 Mich. 502.

*John H. Overall, Henry W. Bond* and *W. G. Schofield* for respondent.

(1)   "It is only where an oral statement admits only of one interpretation that its effect can become a question of law for the court."   In case oral evidence gives rise to different legitimate inferences, it is the exclusive province of the jury to determine which inference should be drawn or which meaning should be adopted.   And the same rule applies even to those writings which afford more than one rational inference of their import.   Banking Co. v. Blell, 57 Mo. App. 410; Bass v. Jacobs, 63 Mo. App. 393; Mantz v. Maguire, 52 Mo. App. 136; Primm v. Haren, 27 Mo. 205; Judge v. Leclaire, 31 Mo. 127; Belt v. Goode, 31 Mo. 128; Frick v. Railroad, 74 Mo. 542; Smith v. Hutchinson, 83 Mo. 683; Huhn v. Railroad, 92 Mo. 440; Chapman v. Railroad, 146 Mo. 481.   (2)   An ambiguous oral contract bears that meaning which is shown by the sense in which the parties have acted it out.   Wetmore v. Crouch, 150 Mo. 671; Smith Drug Co. v. Saunders, 70 Mo. App. 221; Rose v. Eclipse Co., 60 Mo. App. 28; Sedalia Brewing Co. v. Sedalia W. W. Co., 34 Mo. App. 49.   (3) The policy of insurance provided a specific method for the cancellation thereof, and being a written contract,

excluded all prior or contemporaneous parol contracts with reference thereto, not embodied in the policy. Tracy v. Iron Works, 104 Mo. 193; Tuggles v. Callison, 143 Mo. 527; Morgan v. Porter, 103 Mo. 135; Bignall v. Mfg. Co., 59 Mo. App. 673; Loan & Trust Co. v. Workman, 71 Mo. App. 275; Bank v. Cushman, 66 Mo. App. 102.

GOODE, J.—Albert N. Edwards, the respondent, is the trustee in a deed of trust executed by the American Base Ball and Athletic Exhibition Company, November 16, 1900, on the buildings and improvements of said company situated in the National League Base Ball Park in the city of St. Louis, Missouri, and as trustee he instituted this action to recover the proceeds of a policy of insurance issued by the Home Insurance Company on said property, which was destroyed by fire May 4, 1901, while the policy was in force, unless it had been cancelled as the appellant says it had.

The answer pleaded among other things the following special defense:

"Further answering defendant alleges it is provided in said policy as follows: 'This entire policy shall be cancelled at any time at the request of the insured or by the company, by giving five days notice of such cancellation. If this policy shall be cancelled as hereinbefore provided or become void, or cease, the premium having been actually paid, the unearned portion shall be returned on surrender of this policy or last renewal, this company retaining the customary short rate; except that when this policy is cancelled by this company, by giving notice, it shall retain only the pro rata premium.' Defendant alleges that no premium was ever paid by insured or by any one for it for said policy; that on April 17, 1901, defendant duly notified said insured that it would decline to carry said risk and that said policy was cancelled, and it demanded of insured the surrender of said policy; that on April 24,

1901, the said insured did, in compliance with defendant's request, surrender and deliver to it said policy, so that all liability of defendant thereunder, if any ever existed, which it denies, thereupon ceased and determined and plaintiff is not entitled to recover.''

A replication was filed containing this new matter:

''Now at this day comes plaintiff, and for replication to defendant's answer, says: That on or about the 24th day of April, 1901, the said policy of insurance was in possession of the National Bank of Commerce, in St. Louis, Missouri; that the agents of defendant in the city of St. Louis, where said bank has its place of business, without any notice to the insured that said policy of insurance had been or would be cancelled, and without the knowledge of plaintiff, received from said bank said policy of insurance, under promise that the said policy should remain in force until the same or some other policy equally good and for the same amount should be returned to said bank; that neither the same nor any other policy in place thereof was afterwards delivered to said bank.

''Further answering plaintiff denies each and every allegation, matter, fact and thing in the answer alleged, not herein expressly admitted, and, having fully replied, asks for judgment as in petition prayed.''

M. S. Robison, who is the vice-president and treasurer of said American Base Ball & Athletic Exhibition Company, held the note of the company for $48,500, secured by a deed of trust in which the respondent Edwards was trustee, and the insurance policies on the property embraced in the deed of trust were made payable to the trustee as his interest might appear for the further security of the beneficiary. Robison had borrowed $15,000 from the Bank of Commerce on his note and to secure that loan had deposited with the bank as collateral said note of the base ball company, with the deed of trust and policies that accompanied it as se-

curity, and those documents were held by the bank when
the fire occurred.

The facts in regard to the issuance of the policy in
suit are these: Robison as vice-president and treas-
urer of the base ball company was exclusively charged
with keeping its property insured. Between the fifth
and twelfth of April, 1901, he applied to the firm of
Roeslein & Robyn, who were insurance agents and
brokers in the city of St. Louis, for insurance to take
the place of certain policies which would expire at
noon on the seventeenth of that month. They agreed to
get new insurance, but encountered considerable diffi-
culty in inducing companies to write the risk and ap-
pealed to the agency of Geo. D. Capen & Co., who were
agents for certain insurance companies, including the
Home, to help them cover the property. That firm ex-
pressed doubt as to whether any of the companies they
represented would carry the risk, but finally agreed to
write policies in some of their companies on the condi-
tion and understanding that the clause of the policy
requiring five days notice of cancellation should be
waived; or, in other words, that on notice of the rejec-
tion of the risk by a company, its policy should be
cancelled forthwith. This occurred on the twelfth of
April and several policies, including the one in suit,
were written that day to take effect at noon on the seven-
teenth. On the twenty-fourth of April, Robison ac-
companied the base ball club on an eastern tour and got
back the evening of the first day of May. On the
twenty-fifth of April, Capen & Company received a
letter from the general office of the Home Insurance
Company in New York, notifying them of its refusal
to carry the risk on the base ball company's property
and directing them, as the Home's agents in St. Louis,
to see that it was relieved of liability on the risk.
Capen & Company went immediately to the office of
Roeslein & Robyn, which was on a lower floor of the
same building where Capen & Company's office was and

notified Roeslein & Robyn of the cancellation of the policy. Noel Robyn took said letter written from the Home's New York office, to the base ball park and showed it to Muckenfuss, bookkeeper of the base ball company, Robison, as stated, being out of the city. Robyn also showed Muckenfuss a list of several other companies that had ordered their policies cancelled, saying he wished to take them up. Muckenfuss told him the policies were in the National Bank of Commerce and arranged for Robyn to meet him there at half-past nine o'clock. They met accordingly and transacted the business they had with Cowen the assistant cashier of said bank.

There is a dispute as to what was said when the policies were taken from the bank. Cowen and Muckenfuss say that Robyn stated he wished to withdraw some policies covering insurance on the base ball company's property, handing Cowen a list of them, and promising the latter to keep the insured property covered until new insurance was written.

Cowen swore the bank relinquished some of the policies to Robyn on that condition and with that understanding. Robyn denied this and said he simply asked for and took certain policies, stating that they had been cancelled by the company.

Robison testified he knew nothing about those policies being taken up and cancelled until the second day of May, when his attention was called to it by Muckenfuss. He saw Roeslein & Robyn on the following day in regard to the matter and a conversation occurred which is recited below.

When Robyn got the policy in suit from the bank, he returned it to the Home Insurance Company, no premium having as yet been paid on it, and that company had it when the present action was begun.

The contention of the respondent is that the policy had not been legally cancelled at the time of the fire for lack of five days prior notice to Robison or any one

else authorized to receive notice on behalf of the base ball company; while the theories of the appellant are: first, notice to Roeslein & Robyn was sufficient; second, notice to Muckenfuss the bookkeeper was sufficient; third, Robison himself knew of the cancellation five days before the fire (of which there is slight, if any, evidence); fourth, Robison knew of the cancellation on the second or third of May before the fire, thereby waiving the five days' notice; fifth, the poicy was issued on the condition and understanding that the five days' notice of cancellation was waived.

It is necessary to state fully the testimony of Robison in regard to the relation sustained by Roeslein & Robyn to the Base Ball & Athletic Exhibition Company. Robison testified, as stated above, that the duty was left to him to see that insurance was taken out on the property and to look after it; that the insurance on the property at the time the fire occurred was procured through Roeslein & Robyn, who occupied the position to the base ball company of both insurance agents and insurance brokers; that when he discovered most of the company's insurance would expire on the seventeenth of April, he sought Roeslein & Robyn and asked them to replace it and they said they would; that all previous insurance had been placed through them for the years 1899 and 1900; that in 1899 the policies were issued about April seventeenth and the premiums paid on the sixteenth of May, the check being given to Roeslein & Robyn; in 1900, the policies were issued at the same time and paid for by check on the ninth of August: that the base ball company never paid premiums to the insurance companies, but always to Roeslein & Robyn. Robison testified further:

"I never asked anybody else in the city to place a dollar's worth of insurance on the property, or outside the city up to that time" (namely May second or third, when the conversation between him and Robyn took place about the difficulty in procuring insurance).

"We had placed everything in their hands and they had always kept it fully covered."

He also testified as follows:

"Q. Now do I understand you that you depended on Roeslein & Robyn to look after your insurance matters for you? A. Yes, sir.

"Q. They were your sole dependence? A. Yes, sir.

"Q. You never applied to any other agent or agents in the city with reference to the matter? A. Not up to the time I called there on the 3d of May.

"Q. And you gave it no personal attention yourself? A. No, sir, not outside—(interrupting).

"Q. Outside of calling attention to the fact that you wanted a certain amount of insurance? A. Yes, sir.

"Q. And you wanted the insurance kept in force? A. Yes, sir.

"Q. And you depended on them to do that? A. Yes, sir.

"Q. Of course you didn't dictate what companies? A. No, sir, except they were to be good companies.

"Q. In fact, you didn't know just what companies you were insured in? A. Well, I knew about as much about that as I would about any insurance company.

"Q. Did you have a policy in the Home Insurance Company the year previous to May 17, 1901? A. I couldn't tell you that.

"Q. I mean April 17, 1901? A. I don't know.

"Q. You don't know whether you did or not? A. No, sir.

"Q. Don't you know that you didn't have? A. No, sir, I couldn't tell you that.

"Q. Don't you know that this is not a renewal of any policy at all that you had had previously? A. I think the question you asked me was, did we have any insurance with that company? Is that your question?

"Q.   Yes, sir.   A.   I couldn't state whether we had any before that with that company or not.

"Q.   You don't know?   A.   No, sir, I don't.

"Q.   You paid no attention to that?   A.   No, sir, I trusted to them what companies they placed our insurance in.

"Q.   You depended on them to select the companies for you to keep the property insured?   A.   Yes, sir.

"Q.   What was the amount of insurance?   A. Twenty-three thousand five hundred.

"Q.   Was that the amount they were directed to procure?   A.   No, sir; they were directed to keep twenty thousand.

"Q.   How did you happen to go to Roeslein & Robyn's office on the 3d of May?   A.   I wanted to find out what policies they had taken away and how much insurance there was on the property.

"Q.   Taken away from where?   A.   Taken away from the Bank of Commerce.

"Q.   You had learned that the policies had been delivered up, had you?   A.   Yes, sir.

"Q.   When did you learn that?   A.   On the day before, the 2d of May.

"Q.   You knew then on the 2d of May that these policies had been delivered back to the company?   A. I knew they had been delivered to Roeslein & Robyn.

"Q.   Back to your agents?   A.   Yes, sir.

"Q.   You didn't know whether they had been delivered back to the agents of the insurance company or not?   A.   I didn't know anything about that.

"Q.   Didn't they tell you at that time that it was impossible for them to carry the insurance here in St. Louis?   A.   On the second of May?

"Q.   Yes, sir?   A.   Yes, sir.

"Q.   And you requested them to mail you the form and so forth to the Burnett House in Cincinnati?   A. Yes, sir.

"Q. And you would see if you could place it there? A. If I could place it down east.

"Q. Either in Cincinnati or elsewhere? A. Yes, sir.

"Q. Before you went east the property burned? A. Yes, sir.

"Q. The way you did this business, as I understand it, you depended on Roeslein & Robyn to pay the premiums to the different companies, then when they rendered you the bill you paid them whatever it amounted to? A. Yes, sir.

"Q. That is, if you didn't pay it right away you paid it some time? A. Yes, sir.

"Q. Did they ever render you any bill for this policy? A. I don't think they ever did.

"Q. There had no premium ever been paid on this policy, has there? A. It has been tendered for it.

"Q. When? A. On the 6th of May.

"Q. But that was after the fire? A. Yes, sir.

"Q. No premium had been tendered up to that time of the fire? A. No, sir; there hadn't been on any of the policies."

It was shown the base ball company kept a record of its insurance policies in a book, stating the amount of each, when it took effect and when it expired; also notings as to exchanges and cancellations.

The morning of April 17, 1901, Noel Robyn took up the Phoenix policy which was replaced probably by the one in suit, and an entry made by Muckenfuss in the company's books that the Phoenix policy was "cancelled." Robison testified:

"Q. Who first made the arrangement with the firm of Roeslein & Robyn to look after your insurance for the Base Ball Park Company? A. Mr. E. C. Becker.

"Q. When was that? A. In April, three years ago.

"Q. That same arrangement was kept up right along? A. Yes, sir.

"Q. Were the policies renewed .in 1900? A. Yes, sir; they were renewed each year."

There was testimony to show Muckenfuss had nothing to do with procuring insurance, but that he was simply bookkeeper and whatever entries he made in regard to insurance were made under the direction and supervision of Robison; and perhaps there was slight evidence tending to show he acted independently of Robison in looking after insurance.

The particular policies to take effect on April 17, 1901, bore a higher rate of premium than had previously been charged, of which fact Robison was notified by Roeslein & Robyn before they were written, and he agreed to the increased rate.

We will state Robison's testimony in regard to the interview with Roeslein & Robyn on the second or third of May. After testifying that this policy had been deposited in the National Bank of Commerce with sixteen others, on the 17th day of April, he proceeded as follows:

"Q. When did you next hear of this particular policy of insurance? A. When did I next hear of this policy?

"Q. Yes, sir? A. It was on the 2d of May.

"Q. What year? A. 1901.

"Q. What did you do when you heard of it? A. I went down to Mr. Roeslein & Robyn to see what policies had been taken away from the bank and how much insurance we had left there; and I found this was one of the policies that had been taken away. I would like to correct that.

"Q. Certainly correct it. A. I only got—the first intimation I had that any policies had been taken away was on the second of May, by a note that my

Vol 100 app—45

bookkeeper left on my desk about this as one of the policies that was taken.

"Q.  In consequence of that information you went down to the office of these insurance brokers did you? A.  That was partly so.  On that same day Mr. Cowen, cashier of the bank, informed me they had taken a number of other policies besides what they had taken the first day.

"Q.  Before pursuing that any further, was there a different rate of premium charged in this policy over those which showed they had been replaced the year before?  A.  Yes, sir.

"Q.  Did you at that time ever receive any notice of the desire of the company to cancel these policies? A.  Only on the 3d of May, 1901.

"Q.  As the result of that fire what became of the property insured?  A.  Why, the grand stand and pavilion —

"Q.  I mean, covered by this policy; was it totally destroyed or not?  A.  All except one of the items.

"Q.  Yes, sir, that we don't sue for here?  A. No, sir.

"Q.  What was the value of the property destroyed?  A.  Something over twenty-seven thousand.

"Q.  Over how much?  A.  Over twenty-seven thousand dollars.

"Q.  Do you remember anything else that occurred in the conversation you had with Roeslein & Robyn or any one of that firm on the 3d of May, 1901?  A.  Yes, sir.

"Q.  Well, state it to the jury?  A.  Mr. Robyn suggested to me—he said he had hard work to replace all the insurance, to keep up the amount we wanted; he suggested to me that I take hold of it myself and see what I could do.  I told him that I would do so, and that is the first notice that I had, or the first time that I had been outside of his office to get any insurance.  I never asked anybody else in the city to place a dollar's

worth of insurance on the property, or outside the city, up to that time. We had placed everything in their hands, and they had always kept it fully covered. I took the matter up the next day; tried to get some insurance and the fire occurred on that day. I told Mr. Robyn if he would forward blank forms he had to me at Cincinnati, as I expected to go on Monday night, and was on my way east, or would be, I would take the matter up with an agent in New York, who had placed insurance for me on railroad property, and if he would send on these blank forms to me at Cincinnati I would take them down with me.

"Q. The understanding was between you and Robyn that you should help him if you could get other insurance to replace this existing insurance? A. Yes, sir."

The trial court refused an instruction requested by the appellant for a verdict in its favor, but gave this one:

"The court instructs the jury that if you find from the evidence that Roeslein & Robyn were employed or engaged by the American Base Ball & Athletic Exhibition Company to procure insurance for it, and to take charge of its insurance business and to keep its property insured in good companies to a certain amount, and that said firm placed and controlled all the insurance of said exhibition company, and when policies were ordered cancelled by insurance companies, said firm replaced the same, when possible, with other policies as they saw fit, and if you find that said firm advanced premiums for said exhibition company on policies placed by them for it, and if you find that such had been the relations between said firm and said exhibition company for several months, and if you find that Roeslein & Robyn did not countersign or issue the policy sued on, then you are instructed that said firm, were agents of the insured and not of the defendant, and if you find that said firm as agents of the assured, applied to de-

fendant's agents, Capen & Co., for the policy sued on and that said policy was issued by said Capen & Co., as defendant's agents, and delivered to Roeslein & Robyn for the insured, and if you find that afterwards and more than five days before the fire Capen & Co. notified Roeslein & Robyn that defendant would not carry said risk and demanded return of the policy and that said Roeslein & Robyn did surrender said policy to Capen & Co. more than five days before the fire, the plaintiff is not entitled to recover and your verdict must be for defendant.''

The jury returned a verdict for the plaintiff under the instructions given.

If the notice given by Capen & Company to Roeslein & Robyn was a valid and effective notice, the policy was not in force when the loss occurred and no attention need be paid to the other propositions argued by counsel.

By comparing the instruction quoted with the testimony of Robison, it will be perceived that every fact the court told the jury they must find as to the acts and authority of Roeslein & Robyn as insurance brokers employed by the base ball company, the duties they performed and the powers they exercised in behalf of said company, was positively sworn to by Robison himself, and if said instruction was rightly given, it would have been right to give the peremptory instruction requested by the appellant.

Were Roeslein & Robyn such general agents and representatives of the base ball company in connection with its insurance affairs that notice to them of the cancellation of the policy in suit affected and bound the company, so that their surrender of the policy and its cancellation on that notice ended the liability of the appellant?

The cases on this subject are in accord and lay down two propositions:

First. A broker employed by an owner to procure

a policy of insurance on property, or a line of insurance, has completely performed the subject-matter of the agency when he gets the insurance; his employment is then at an end and subsequent notice to him by a company which wrote a risk on the property, of the cancellation of its policy, is no notice to the assured, nor a compliance with a provision of the policy that notice must be given to the assured; and an attempt to cancel on such notice is a nullity. Rothchild v. Ins. Co., 74 Mo. 41; Gardner v. Ins. Co., 58 Mo. App. (K. C.) 611; Grace v. Ins. Co., 109 U. S. 278; Syconning v. Ins. Co., 90 Ill. 545; Herman v. Ins. Co., 100 N. Y. 411; Ins. Co. v. Hartwell, 100 Ind. 566; Ins. Co. v. Raden, 87 Ala. 311.

Second.  When a broker is entrusted by an owner with the duty of keeping the owner's property insured, taking out policies thereon, renewing same when they expire, paying premiums to be repaid to the broker by the owner, and obtaining other insurance in lieu of expired or cancelled policies, and this course of dealing has been carried on for some time, the broker is the general agent of the owner in respect to the latter's insurance, and notice of cancellation given to the broker binds his principal. McCartney v. Ins. Co., 33 Mo. App. (K. C.) 652; Huggins v. Ins. Co., 41 Mo. App. (K. C.) 530; Gardner v. Ins. Co., supra; Hodge v. Ins. Co., 33 Hun (N. Y.) 583; Stone v. Ins. Co., 105 N. Y. 543; Davis Lumber Co. v. Ins. Co., 95 Wis. 227; Schaeur v. Ins. Co., 60 N. W. (Wis.) 994; Hartford Ins. Co. v. Reynolds, 36 Mich. 502; Dibble v. Ins. Co., 70 Mich. 1; Buick v. Ins. Co., 103 Mich. 75; Royal Ins. Co. v. Wright, 55 Fed. 455; White v. Ins. Co., 93 Fed. 161; Mutual Assurance Society v. Ins. Co., 84 Va. 116; Ostrander on Insurance, p. 53; 16 Am. and Eng. Ency. Law (2 Ed.), 974; Mechem on Agency, sec. 931.

Our statute says:

"Whoever for compensation acts or aids in any manner in negotiating contracts of insurance or re-

insurance or placing risks or effecting insurance or re-insurance for any person other than himself and not being the appointed agent or officer of the company in which such insurance or re-insurance is effected, shall be deemed an insurance broker.'' R. S. 1899, sec. 7997.

Roeslein & Robyn come within that definition of a broker, we think, although it is true they got their compensation by deducting their fees from the premiums paid them by the base ball company before turning them over to the agents of the insurance companies. Plainly, Roeslein & Robyn were not the agents of the Home Insurance Company, for, as brokers of the base ball company, they applied to Capen & Company, agents of the Home Insurance Company, to write the risk, and in the transaction Capen & Company represented the insurance company and Roeslein & Robyn represented the base ball company. The latter did not assume to represent the insurance company and could not have represented it, since no agent can serve two masters. Huggins Cracker Co. v. Ins. Co., 41 Mo. App. (K. C.) 530; DeSteiger v. Hollington, 17 Mo. App. (K. C.) 388; Ins. Co. v. Hope, 8 Mo. App. (St. L.) 408.

A broker acting for a property-owner, as Roeslein & Robyn acted in this case, is always held to be the agent of the assured. Mechem on Agency, sec. 931; Ins. Co. v. Brooks, 34 Atl. (Md.) 373; Hamblett v. Ins. Co., 36 Fed. 118; Ins. Co. v. Reynolds, supra; Standard Oil Co. v. Ins. Co., 64 N. Y. 85.

As Roeslein & Robyn were insurance brokers and agents of the base ball company, the question of whether notice to them of the cancellation of the policy bound the base ball company, turns on whether their agency was a general one or merely special; that is, whether they were employed to procure a given line of insurance or to represent the base ball company generally in its insurance business; for that is the test in all such cases, as the authorities cited show.

A general agent is one who is empowered by a prin-

cipal to transact all his business of a particular kind; while a special agent is one authorized to act only in a specific transaction. Mechem on Agency, sec. 6; Butler v. Maples, 9 Wall. 766; Cross v. Railway Company, 71 Mo. App. (K. C.) 590.

A person dealing with an agent appointed to transact generally a certain class of business for his principal has the right to presume a much wider authority is vested in such agent than he would were the agent empowered to act only in a particular instance; and may in the former case, rely on the agent's acts unless they go beyond those usually done by general agents. Mechem on Agency, secs. 284, 285. Notice to any agent, either general or special, binds the principal if it is in reference to a matter included in the agent's authority and while he was still representing the principal. There is no difference in the effect of notice, to whatever class the agent belongs; but as the scope of a general agent's authority is more extensive, so notice to him is correspondingly effective and will often be good as relating to a subject falling within his authority when it would be bad to a special agent as relating to a matter outside his. On principle, a company's notice declining to carry an insurance risk, given to a broker empowered generally to look after all the policyholder's insurance business and who has exerted that power continuously for a considerable period, ought to be sufficient; and all the cases we have examined hold it is sufficient.

It is difficult to see how an agent could have more extensive powers in connection with the business of his principal than Roeslein & Robyn had as brokers for the base ball company as for several years said company's insurance affairs had been committed entirely to their charge; and if an insurance company ever has the right to rely on a broker's authority being wide enough to render a notice of cancellation to him a good compliance with the requirement of notice to the in-

sured, that right existed in this instance. The cases cited as supporting the second proposition of law above stated, conclusively establish that notice to a general broker is effective and the facts of several of them were practically identical with those in the case at bar as testified to by Robison.

The able counsel for the respondent invokes the rule that where different inferences may legitimately be drawn from oral evidence, it is for the jury to say what inference shall be drawn; but that rule we think is inapplicable to the present case. The doctrine that juries are the sole judges of the weight of evidence, and entitled to deduce any inference it will legitimately bear, does not mean that, if a plaintiff proves by uncontradicted testimony facts which defeat his own claim, a jury may disregard the only testimony offered and give him judgment notwithstanding, else there is no need to introduce evidence at all and a demurrer to a plaintiff's case could never be sustained, as it must be unless there is a prima facie case. Pope v. Boyle, 98 Mo. 521; Hyde v. Railway, 110 Mo. 272. Robison is not the plaintiff in this case, but he was the vice-president and treasurer of the base ball company, and his testimony in regard to the scope of the agency of Roeslein & Robyn is corroborated by all the other testimony. There is nothing in the record, so far as we have detected, from which an inference could be properly drawn by the jury contrary to the facts hypothecated in the instruction above quoted, in which they were told, if they found the specified facts, to return a verdict for the defendant. In returning one for the plaintiff, they ignored the positive direction of the court and all the evidence in the case and their verdict can not be allowed to stand. The trial court should have given the peremptory instruction requested by the appellant in the first instance, and having failed to do so should have set aside the verdict of the jury. In some

of the cases supra, the ruling on similar facts was that there was nothing to submit to the jury.

The judgment is reversed. *Bland, P. J.,* and *Barclay, J.,* concur.